# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### CENTRAL DIVISION
#### LEXINGTON

**CIVIL ACTION NO. 09-232-JBC**

**JEFFREY ALCORN, ET AL.,**                                      **PLAINTIFFS,**

**V.**                    **MEMORANDUM OPINION AND ORDER**

**SCOTT COUNTY DETENTION CENTER, ET AL.,**                    **DEFENDANTS.**

\* \* \* \* \* \* \* \* \* \* \*

Pending before the court are the motions for summary judgment by certain defendants. For the reasons discussed below, the motions will be granted.

## I. Facts

The facts of this case, viewed in a light most favorable to the plaintiffs, are as follows: Jeremy Alcorn hanged himself from a showerhead on June 15, 2009, while in pre-trial detention at the Scott County Detention Center (SCDC). At the time of his death, Alcorn was 22 years old and a resident of Scott County, Kentucky. He was survived by his parents, Jeffrey and Melanie Alcorn; his brother, Joshua Alcorn; and his two-year-old son, Brenton Alcorn, whom he fathered by Brittany Cassidy, his girlfriend.

Jeremy Alcorn had been at the SCDC since his arrest on April 15, 2009. He was charged with criminal mischief, theft, burglary, and trafficking in a controlled substance. Jeremy spoke to Brittany Cassidy on the telephone several times while in custody at the SCDC. During some of these conversations, Alcorn threatened suicide. However, Brittany never relayed these threats to the SCDC or to Alcorn's family, and although these conversations were recorded by the SCDC, they were not monitored.

Consequently, their contents were not discovered until after Alcorn was dead.

On June 5, 2009, while still in the SCDC, Alcorn wrote a letter to his parents. *See* R. 43, Exh. 4. The contents of the letter led Alcorn's parents to suspect that he was contemplating suicide. In the letter, he curses Brittany, tells his parents he loves them, and apologizes for his behavior. He also says he's sorry "that it has to end up this way. I didn't want it to, but I could not take the pain." He also requests a list of songs to be played "when it's the last goodbye." Upon receipt of the letter, Alcorn's parents called Joshua Alcorn, read him the letter, and asked that he contact the jail.

Joshua Alcorn called the SCDC on June 7, 2009. An unidentified woman answered his call. Joshua told the woman that the family had received a suicide note. The woman told him that Alcorn would be "put on suicide watch for two weeks or two months depending on when the Jail could arrange for him to be evaluated."

That same day, the SCDC contacted Emily Karen McAllister and informed her of Alcorn's letter and the family's concern. McAllister is the clinical coordinator for the Bluegrass Regional Mental Health-Mental Retardation Board. As part of her duties, McAllister routinely conducts jail triage interviews to assess inmates who are suspected of having suicidal tendencies. Upon hearing of Alcorn's letter, McAllister called and spoke with Alcorn. She asked him about his incarceration, about his mental health, about his medication, and about suicide. According to McAllister, Alcorn was calm and denied having any thoughts of killing himself. During this conversation, McAllister completed a Telephonic Behavioral Health Jail Triage form. R. 43, Exh. 5. McAllister determined that Alcorn's suicide risk was low, allowing him to return to the general jail population.

The next day, Alcorn was interviewed in person by Genie McFall, who is a licensed psychological practitioner working for Bluegrass Comprehensive Care Center as an outpatient therapist. McFall interviewed Alcorn at the jail to follow up on McAllister's telephonic interview. In the interview, McFall asked Alcorn about the letter, and told him that his family was concerned that it was a "suicide letter." Alcorn again denied that he was suicidal. McFall determined that Alcorn was not a suicide risk and allowed him to remain with the general jail population.

On June 9, Alcorn's cousin, Michael Hicks, went to the SCDC. Hicks had also received a phone call from Alcorn's parents about the letter. Hicks spoke with one of the deputies for approximately five minutes. During this conversation, Hicks said that the family had received a "goodbye letter" and wanted to know if Alcorn could be watched. The deputy told Hicks that Alcorn would be fine, and "that there is no way he can get hurt."

Between June 9 and June 15, Alcorn remained on low risk assessment. During this period, the SCDC staff did not notice any behavior or actions to suggest that Alcorn was considering killing himself. On June 15 at approximately 5:00 p.m., Alcorn attempted to call Brittany at her house. The phone call was answered by a police officer, who notified Alcorn that Brittany was under arrest for a felony drug violation. Alcorn asked about Brenton, their son, and was told that Brittany's parents were on their way to pick him up. Later that day Alcorn spoke with Brittany's step-father and with his parents. According to the other inmates, Alcorn was visibly upset during and after these phone calls.

At approximately 10:30 p.m. on June 15, Alcorn went to the shower in his jail

"pod." At 10:48 p.m., Sgt. Paul Abney conducted a head count of Alcorn's pod. Although Sgt. Abney could not see him, Alcorn verbally responded from the shower stall that he was all right. Shortly thereafter, inmate Clarence Isaacs heard the water in the shower stop running. At 11:00 p.m., Isaacs walked toward the shower and asked Alcorn if he was all right. Alcorn did not respond. Isaacs then walked closer and saw Alcorn's reflection in the shower window. Isaacs then pulled the shower curtain back and saw Alcorn hanging from the showerhead. R. 43, Exh. 2, Part 8. He immediately alerted SCDC Deputy Shawn Stroub by banging on his cell door. Deputy Stroub entered the cell and saw Alcorn hanging in the shower. Stroub stated that he called Alcorn's name but that he was not moving and was "pale white." Based on this, Stroub thought he was "already gone." Stroub also stated that it appeared that he had been hanging for a long time. He then radioed to the other guards. Stroub did not cut Alcorn down. After Stroub radioed for help, additional officers arrived within 10-20 seconds.

The first of those additional officers were Sergeant Mark Mulligan and Deputy Ryan Smith. Upon arriving in the shower, Deputy Smith checked for a pulse on Alcorn's wrist and neck, but could not find one. Neither Smith nor Mulligan attempted to cut Alcorn down. Smith stated that he could tell "colorwise" that Alcorn was deceased when he arrived.

At 11:05 p.m., Scott County 911 was called., and at 11:09, Scott County EMS arrived. The EMS personnel checked Alcorn for a pulse with an EKG machine but found none. At 11:10, SCDC notified Scout County Coroner John Goble of the situation.  At 11:36, Goble arrived and declared Alcorn dead. At 1:22 a.m., on June 16, Goble took Alcorn's body to the Scott County Coroner's Office.

It was later determined that Alcorn used pieces of a T-shirt braided together to hang himself. Inmates on "moderate" or "high" suicide watch are not allowed access to T-shirts; however, as described above, Alcorn was on low suicide watch throughout his time at the SCDC. At the time of his death, Alcorn also had a cut on his wrist that appeared three to four days old.

According to Jailer Larry Covington, all employees are trained in the jail's Policy and Procedure Manual. This manual dictates that an "officer who first witnesses, or otherwise discovers, an inmate who appears dead or has made a physical attempt at suicide will: (a) First, use emergency medical procedures. . . ." However, several SCDC guards later indicated that they had been instructed not to cut a prisoner down in these situations. Deputy Stroub indicated that he had been instructed not to cut down an inmate who had hanged himself if he appears dead and that it should be treated as a crime scene and left intact. Deputy Smith stated that he had been told that if someone was hanging, he was never to cut him down unless there were signs of life. Smith also stated that he heard that this direction came from the coroner's office. Sergeant Mulligan likewise stated that the coroner told him not to cut a prisoner down and to preserve the area as a crime scene. According to Mulligan, this instruction was given in connection with a prior suicide at the SCDC.

## II. Analysis

The plaintiffs assert various causes of action against the defendants, including violations of Jeremy Alcorn's right to privacy and his right to be free from cruel and unusual punishment. They also allege that the defendants acted with negligence (and gross negligence) by failing to treat Alcorn's mental condition; failed to adequately

supervise their agents; and intentionally inflicted emotional distress on Alcorn and his family. For the reasons discussed below, only Alcorn's right to be free from cruel and unusual punishment will be discussed in any detail.

## A. Federal Causes of Action

In their amended complaint, the plaintiffs assert that the defendants violated Alcorn's right to be free from cruel and unusual punishment in contravention of 42 U.S.C. § 1983.[1] Alcorn also alludes to a right-of-privacy claim. This latter claim fails at the outset. Because Alcorn has not provided any evidence from which a jury could find that his "right to privacy" was violated, and has not even addressed it in his response to the defendants' motion, summary judgment is appropriate on this claim.

The plaintiffs next argue that the defendants violated Alcorn's right to be free from cruel and unusual punishment in two ways: first, by failing to take adequate precautionary measures in response to the suicide letter Alcorn sent to his parents, and second, by not cutting Alcorn down when he was discovered hanging in the shower. Because there are no genuine issues of material fact, the defendants are entitled to summary judgment.

This case is one in a long line of similar cases where prisoners and pretrial detainees have unfortunately taken their own lives. *See, e.g., Perez v. Oakland Co.*,

---

[1]Because the Eighth Amendment does not apply to pretrial detainees such as Alcorn, the right to be free from cruel and unusual punishment attaches through the Due Process Clause of the Fourteenth Amendment, which affords Alcorn rights analogous to those of prisoners. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001).

466 F.3d 416 (6th Cir. 2006); *Williams v. Mehra*, 186 F. 3d 685 (6th Cir. 1999); *Soles v. Ingham Co.,* 148 F. App'x 418 (6th Cir. 2005); *Davis v. Fentress Co.*, 6 F. App'x 243 (6th Cir. 2001); *Criswell v. Wayne Co.*, 165 F.3d 26 (6th Cir. 1998) (per curiam); *McKee v. Turner*, 124 F. 3d 198 (6th Cir. 1997) (table); *Shouse v. Daviess Co.*, 2009 WL 424978 (W.D. Ky., Feb. 19, 2009). Consequently, the law in this area is well-established. Plaintiffs bringing claims under §1983 must identify a right protected by the U.S. Constitution, as well as a deprivation of that right by a person acting under the color of state law. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001). The right identified by the plaintiffs is that of all prisoners to be free from "unnecessary and wanton infliction of pain," including "deliberate indifference to [their] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97 (1976) (citations omitted).

The plaintiffs have not established a deprivation of Alcorn's constitutional rights.[2] In order to make out a violation under § 1983, the plaintiff must demonstrate the presence of both objective and subjective components. Courts agree that "psychological needs manifesting themselves as suicidal tendencies are serious medical needs." *Linden v. Washtenaw Co.*, 167 F. App'x 410 (6th Cir. 2006) *(quoting Crocker v. Co. of Macomb*, 285 F. Supp. 2d 971 (E.D. Mich. 2003)). Hence, the objective component is satisfied. However, the plaintiffs must also show that the defendant acted with "deliberate indifference" to their health or safety. *Linden*, 167 F.

---

[2] The conclusion that there was no constitutional violation dictates that the defendants are entitled to qualified immunity, given that the first prong of the qualified immunity test asks whether there was a constitutional violation. *Everson v. Leis*, 556 F.3d 484 (6th Cir. 2009); *Linden v. Washtenaw Co.*, 167 F. App'x 410, 415-25 (6th Cir. 2006).

App'x 410. This is the subjective inquiry – that is, it looks at the defendant's actual state of mind, not that of an average or reasonable person standing in the defendant's shoes. Thus, to establish deliberate indifference, "the plaintiff must allege facts which, if true, would show that the official being sued perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). "This standard requires that the defendant's *mens rea* be higher than negligence but lower than purposeful or knowing infliction of harm." *Linden*, 167 F. App'x at 416. *See also Watkins*, 273 F.3d at 686 ("If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has *not* violated the Eighth or Fourteenth Amendments.") (emphasis added).

The plaintiffs have provided no evidence suggesting deliberate indifference on the part of the defendants, either by leaving Alcorn on low suicide watch, by not cutting him down when he was discovered hanging, or by enacting the custom that arguably caused the guards to leave him hanging after he was discovered. Therefore, because the plaintiffs have not shown that there is a genuine issue of material fact concerning the subjective component of their § 1983 claim, the defendants are entitled to summary judgment.

### i. Leaving Alcorn On Low Suicide Watch

The plaintiffs claim that the defendants violated Alcorn's rights when they left him on "low" suicide watch[3] after being alerted to his suicidal tendencies. This claim is

---

[3]It appears that "low" suicide watch is equivalent to being in the general prison population at the SCDC, and that no extra precautions are taken when an inmate is on

without merit. The plaintiffs have not shown that any of the defendants at issue acted with deliberate indifference by leaving Jeremy Alcorn on low suicide watch.

At the time the decision was made to leave Jeremy Alcorn on low suicide watch, the evidence that he was suicidal was minimal. The only evidence concerned the letter Alcorn sent to his parents on June 5. Both Alcorn's brother and his cousin notified the SCDC of the family's concern. Although the identity of the employee who answered Joshua Alcorn's phone call is unknown, the employee did not ignore the warning. Emily McAllister, the clinical coordinator for the Bluegrass Regional Mental Health-Mental Retardation Board, called and spoke with Alcorn the same day to discuss the letter. In addition, Genie McFall, a licensed psychological practitioner with Bluegrass Comprehensive Care Center, went to the SCDC to interview Alcorn the following day.

The decisions by McAllister and McFall are not at issue here. Although both recently moved for summary judgment, their actions are not yet before this court and neither is employed by the SCDC. The defendants whose motions for summary judgment are before the court are the SCDC guards, the Scott County defendants, John Goble, and the Coroner's Office. These defendants took appropriate steps in response to the information they received about Alcorn's suicide letter. They also appear to have had no role in the decision to leave him on low suicide watch.

Even if the decision to leave him in the general prison population could be attributed to the SCDC or its staff, such a decision was not deliberately indifferent to Alcorn's health. Plaintiffs bringing § 1983 claims in these situations must show that "the

_____

"low" watch.

decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure [by a defendant] to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs." *See Linden*, 167 F. App'x at 416 (alterations in original) (citations omitted). Here, both McAllister and McFall interviewed Alcorn about the letter and both determined that he was not at risk for suicide. In these interviews, Alcorn was calm, denied being suicidal, and suggested that his family had overreacted to the letter. Alcorn remained on low suicide watch for nearly a week after the SCDC was first alerted to Alcorn's letter, during which time his behavior was normal and he never attempted to harm himself. Moreover, the plaintiffs offer no proof that any of the defendants had either reason or opportunity to reassess Alcorn's suicide risk after he heard about Brittany's arrest on drug charges. Because the plaintiffs have offered no evidence that this decision was deliberately indifferent, the defendants are entitled to summary judgment on this claim.

### ii. Not Cutting Alcorn Down

The decision not to cut Alcorn down did not violate his constitutional rights. "[T]he Eighth Amendment prohibits mistreatment only if it is tantamount to 'punishment,' and thus courts have imposed liability upon prison officials only where they are 'so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain.'" *Perez v. Oakland County*, 466 F.3d 416 (6th Cir. 2006). Alcorn has not shown that any of the defendants evinced such disregard.

## a. SCDC Guards

Alcorn named several SCDC guards as defendants in this suit. Because the guards subjectively believed that Alcorn could not be resuscitated, they lacked the state of mind necessary to impose liability under the Eighth Amendment. *See Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001). The guards are therefore entitled to summary judgment in their individual capacities.

The plaintiffs must establish that the guards knew of, yet disregarded, an excessive risk to Jeremy Alcorn's safety or health. *See McKee v. Turner*, 124 F.3d 198 (6th Cir. 1997) (unpublished decision). Here, the risk identified by the plaintiffs is the possibility that Alcorn could have been resuscitated but was left to die by the guards. The plaintiffs must show not only that there was a chance for resuscitation, but also that the guards were aware of this potential and nonetheless disregarded it.[4] *Id. See also Farmer*, 511 U.S. at 837 ("[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an *excessive* risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."); *Estelle v. Gamble*, 429 U.S. 97 (1976) ("[A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain.") (quotations omitted).

---

[4]The plaintiffs cite extensively to *Heflin v. Stewart County*, 958 F.2d 709 (6th Cir. 1992); however, the case was decided prior to *Farmer v. Brennan*, 511 U.S. 825 (1994), and failed to use the subjective inquiry demanded by the Supreme Court. It is therefore inapposite to the present discussion.

If Alcorn was already dead when his body was discovered, there would be no basis for liability. *See Brumfield v. Hollins*, 551 F.3d 322 (5th Cir. 2008). The test under the Eighth Amendment is whether the guards were deliberately indifferent to the inmate's health or safety. Once an inmate is dead and cannot be resuscitated, these considerations vanish.

The record contains very little basis for assessing whether Jeremy Alcorn could have been resuscitated. Nonetheless, interpreting all facts in a light most favorable to the plaintiffs, there is sufficient evidence that Alcorn could have been resuscitated. The record indicates that Alcorn was alive at 10:48 p.m. but was found hanging by his neck approximately ten or twelve minutes later. Alcorn apparently used a crude rope made out of a T-shirt to hang himself. Due to the height of the showerhead from which he hung himself, Alcorn's knees were near the floor when he was hanging. *See* R. 43, Exh. 2, part 8. These rudimentary means suggest that Alcorn's death would not have been quick or easy.

The only indications of death noted by the SCDC guards were the absence of a pulse and Alcorn's skin color. Deputy Ryan Smith, one of the first guards to respond to the scene, checked for a pulse in Alcorn's wrist and neck but found none. However, a lack of a pulse does not completely reject the possibility of resuscitation. All the guards were trained in CPR and, as they conceded in their depositions, CPR is generally designed to restart a heart that has stopped beating. Therefore, it is unclear what bearing a lack of a pulse has on determining whether a person can be resuscitated.

The fact that Alcorn was pale white or appeared dead is also of questionable significance. None of the guards were trained to make such judgments, nor have the

defendants provided any indication that this was an accurate measure of whether Alcorn could be resuscitated. It is especially relevant considering the fact that Alcorn could have been hanging for only twelve minutes or less.

On the other hand, the plaintiffs' suggestion that there were outward signs of life is not supported by the record. In their response to the defendants' Motion for Summary Judgment, the plaintiffs claim that no effort was made to cut Alcorn down "despite his body being warm and his pupils being dilated." R. 53 at 5. The record does not support this assertion. Indeed, in the very next sentence, the plaintiffs criticize that the guards "did not check to see if Alcorn's eyes were dilated." *Id.* Nonetheless, given the overall lack of evidence, combined with the short time during which Alcorn could have been hanging, and interpreting the facts in the plaintiff's favor, there is sufficient evidence that Alcorn could have been resuscitated.

Even assuming that Alcorn could have been resuscitated, however, there is insufficient evidence that this possibility was recognized by the guards. Such lack of awareness is fatal to the plaintiffs' attempts to show deliberate indifference. The guards all stated that they believed Alcorn was already dead and could not be resuscitated. *See* Deposition of Shawn Stroub, p. 10 ("In my opinion, I thought he was already gone. I seen no movement, no nothing. He was pale white."); Deposition of Ryan Smith, p. 11 ("[Y]ou can tell colorwise that he was already deceased."). These beliefs, whether correct or not, foreclose any possibility that the guards were deliberately indifferent, and the plaintiffs have provided nothing to rebut them. *Watkins*, 273 F.3d at 686 ("If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has *not* violated the Eighth or Fourteenth Amendments.") (emphasis

13

added).

That the guards may have violated the SCDC's official policy by not attempting to resuscitate Alcorn is not conclusive on the issue of their liability. The plaintiffs emphasize that the SCDC's policies instruct the guards to first "use emergency medical procedures." R. 53 at 9. Their failure to do so here, however, does not establish that they were deliberately indifferent. *See Smith v. Freland,* 954 F.2d 343, 347-48 (6th Cir. 1992) ("Under § 1983, the issue is whether Officer Schulcz violated the Constitution, not whether he should be disciplined by the local police force. A city can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under § 1983."); *Aull v. Osborne*, 2009 WL 111740 (W.D. Ky., Jan. 15, 2009) ("Internal procedures do not set the deliberate indifference standard.") (*citing Andujar v. Rodriguez,* 486 F.3d 1199, 1204 n.5 (11th Cir. 2007)). Rather, this failure indicates, at most, negligence on the part of the guards. *See Andujar*, 486 F.3d at 1204 n.5 ("Failure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence.") (citations omitted).

Although it is perhaps regrettable that the guards did not make an effort to revive Alcorn, the guards must be subjectively aware of the possibility that he was still alive, yet nonetheless decide against resuscitation, before they can be liable. *See Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."). Because there are no facts or other

indications that this was the case, the plaintiffs have not established deliberate indifference on the part of the SCDC guards. Therefore, the guards did not commit a constitutional violation and these defendants are entitled to summary judgment in their individual capacities.

### b. Jailer Larry Covington

There is no basis for imposing liability on Larry Covington in his individual capacity. *Respondeat superior* is not a ground for liability under § 1983. *Cash v. Hamilton County Dept. of Adult Probation*, 388 F.3d 539 (6th Cir. 2004). In order to hold a supervisor liable under § 1983, the plaintiff must show that the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it." *See also Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989)*. Covington had no contact with Jeremy Alcorn during his stay at the SCDC. Nor have the plaintiffs alleged that Covington participated in, authorized, or approved the officers' conduct. Furthermore, there is no evidence that he crafted the policy in question or was otherwise deliberately indifferent to the health of inmates such as Alcorn. "At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers. . . point[ing] to a specific action of each individual supervisor." *Phillips v. Roane County*, 534 F.3d 531, 543 (6th Cir. 2008) (quotations omitted). Here, the plaintiffs have alleged no such specific actions, nor have they given any other basis for holding Covington individually liable for the actions of the defendant officers.

### c. Coroner John Goble

There is no basis for imposing liability on Scott County Coroner John Goble. He played no part in either the decision to leave Alcorn on low suicide watch or the decision not to cut him down when he was found hanging.

Although Goble appears to have been the person responsible for the custom of treating such areas as crime scenes, there is no evidence that he did so with deliberate indifference. *See Perez v. Oakland County*, 466 F.3d 416 (6th Cir. 2006); *Miller v. Calhoun County*, 408 F.3d 803, 813-16 (6th Cir. 2005). He told the guards to leave prisoners hanging only if there were no signs of life. Although this policy might have run the risk of leaving prisoners when a possibility for resuscitation existed, there is no evidence that Goble was aware of the risk, let alone that he was deliberately indifferent to it. *See Miller,* 408 F.3d at 815 (noting that the plaintiff "failed to make the threshold showing of a clear and persistent pattern of mistreatment of detainees"). As discussed earlier, there had only been one suicide in the past several years at the SCDC, and the custom was implemented after that earlier suicide. While it might have been negligent on his part to instruct the guards as he did, such negligence is insufficient for imposing liability under § 1983.

### d. The Scott County Defendants

The plaintiffs also bring suit against the SCDC itself, the Scott County Fiscal Court, the Scott County Coroner's Office, and various officers and employees of the SCDC in their official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (noting that suits against municipal employees in their official capacity are treated as suits against the municipality itself). *See also Wooler v. Hickman Co.*, 2008 WL

5412826 (W.D. Ky. Dec. 30, 2008) ("Hickman County, through its fiscal court, is the policymaker for purposes of § 1983 liability.") (*citing Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)). "To impose § 1983 liability on a municipality or local government entity, plaintiff must show that an officially executed policy, or the toleration of a custom, resulted in the constitutional deprivation." *Linden*, 167 F. App'x 410, 420 (6th Cir. 2006) (*citations omitted*).

A municipality can be liable for a constitutional violation committed by one of its employees where its policy or custom, although facially constitutional, was the moving force behind the employee's action that violated the plaintiff's rights.[5] Municipalities cannot be held liable under a *respondeat superior* theory, but rather where their own actions (such as in enacting a policy or custom) caused the constitutional violation.

Although the plaintiffs have not pressed this issue, there is sufficient evidence that a policy or custom existed within the SCDC that could lead to prisoners being left to hang while a potential for resuscitation existed. *See Cash v. Hamilton County Dept. of Adult Probation*, 388 F.3d 539 (6th Cir. 2004). The claims against the municipality nonetheless fail. Because no individual defendant exhibited deliberate indifference, there is no underlying constitutional violation; consequently, the Scott County defendants are shielded from liability. *See Bowman v. Corrections Corp. of America,* 350 F.3d 537, 545 (6th Cir. 2003) ("[W]ithout a constitutional violation of Anthony's

---

[5]Some courts have also found, in a limited class of cases, that a municipality can be liable directly, just as a natural person, even where no individual actor committed a constitutional violation. *See Canton v. Harris,* 489 U.S. 378 (1989); *Gibson v. County of Washoe*, 290 F.3d 1175, 1185-93 (9th Cir. 2002); *Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002). However, these cases involved markedly different factual and legal issues, and the plaintiffs nowhere claim that they apply here.

Eighth Amendment right by Dr. Coble or Warden Myers, CCA cannot be held liable for its policy, even if it were to encourage deliberate indifference."); *Wren v. Richardson*, 2008 WL 2166531 (E.D. Ky. May 22, 2008) ("[A] § 1983 claim against a municipality requires the court to address two steps: first, whether the plaintiff's harm was caused by a violation; and second, whether the city is responsible.").

There is sufficient evidence to infer the existence of a custom at the SCDC. *See Praprotnik*, 485 U.S. at 121 (*citing Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978)). A custom need not have the trappings of an established law in order for § 1983 liability to attach. *See Cash*, 388 F.3d at 543 (noting that a plaintiff need only "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law") (*quoting Monell*, 436 U.S. at 691). Here, several guards acknowledged being instructed not to "cut down" a prisoner found hanging if it appeared he was already dead. Deputy Shawn Stroub, the first officer to arrive after Alcorn was found hanging, stated in his deposition that he's "been told in the past" not to cut a prisoner down "if they're not moving or anything." Deposition of Shawn Stroub, pg. 10. Similarly, Deputy Mark Mulligan, the second to arrive on the scene, stated, "We have always been told do not disturb a crime scene." Deposition of Mark Mulligan, pg. 8. Deputy Ryan Smith stated that "they told us never to cut them down unless there was signs of life." Deposition of Ryan Smith, pg. 13.  Larry Covington, the jailer in charge of the SCDC confirmed this practice. Deposition of Larry Covington, pg. 21 ("[I]f you determine that the person is deceased, then it then becomes a crime

scene.").[6] This custom appears to have originated at the direction of Scott County

Coroner John Goble. *See, e.g.,* Deposition of Ryan Smith, pg. 13; Deposition of Mark

Mulligan, pg. 9; Deposition of John Goble, pg. 30.

The problems with the custom of leaving prisoners hanging whenever they

appear dead are easy to see. This practice ultimately leaves the determination of

whether to attempt resuscitation to officers who receive no training in this practice.

None were taught how to gauge whether a person could be resuscitated.[7]

Consequently it ran the risk of causing the prison guards to leave an inmate hanging

even when he could have been resuscitated. Nonetheless, because none of the

individuals involved acted with deliberate indifference, Scott County is shielded from

liability under the first prong.

Because none of the guards acted with deliberate indifference, Scott County

cannot be held liable for their actions. Municipal liability absent a finding of liability on

the part of an individual defendant has been a matter of debate in both this and other

circuits. Nonetheless, the clear authority in this circuit compels this court to absolve

Scott County of all liability where its deputies did not violate the constitutional rights of

Alcorn. *See Sigley v. Parma Heights*, 437 F.3d 527 (6th Cir. 2006) (noting the district

court's conclusion that "[i]n the absence of a constitutional violation, there is no

_____

[6]Indeed, Covington gave indications that he believed the SCDC policy was even more restrictive. *See id.* at 16 ("Q: So are you telling me that the procedure at the jail is that they don't find a pulse they don't perform CPR? A: If we determine that they have no pulse, then it becomes a crime scene. Q: So they don't try to revive them if they don't have a pulse? A: No.")

[7]The plaintiffs have not raised, and this court will not address, a failure-to-train claim.

municipal liability under 42 U.S.C. § 1983") (*reversed on other grounds*); *Harbin v. Detroit*, 147 F. App'x 566 (6th Cir. 2005); *Ross v. Duggan*, 402 F.3d 575, 589-90 (6th Cir. 2004) ("[A]s a matter of law, the plaintiffs cannot prove that they had suffered any constitutional tort. Accordingly, as a matter of law, official "municipal liability" cannot be imposed "); *Bowman v. Corrections Corp. of America,* 350 F.3d 537 (6th Cir. 2003) ("[W]ithout a constitutional violation of Anthony's Eighth Amendment right by Dr. Coble or Warden Myers, CCA cannot be held liable for its policy, even if it were to encourage deliberate indifference."); *Sell v. City of Columbus*, 47 F. App'x 685 (6th Cir. 2002) ("To attach such liability to the municipality, a plaintiff must show 'a direct causal link between the custom and the constitutional deprivation.'") (*citations omitted*); *Garner v. Memphis Police Dept.*, 8 F.3d 358 (6th Cir. 1993).

The touchstone for this debate was *City of Los Angeles v. Heller*. 475 U.S. 796 (1986) (per curiam). There, in the context of an excessive force claim, the Court held that all claims against the city had to be dismissed after a jury verdict exculpating the defendant police officer. *See id.* at 799 ("[I]f the latter inflicted no constitutional injury on respondent, it is inconceivable that petitioners could be liable to respondent."). The limits of this holding have since come under scrutiny. *See, e.g., Thomas v. Cook Co. Sheriff's Dept.*, 604 F.3d 293, 304-05 (7th Cir. 2009) ("[A] municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict."); *Fairley v. Luman,* 281 F.3d 913 (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under § 1983."); *Trigalet v. City of Tulsa*, 239 F.

3d 1150-56 (10th Cir. 2001); *Fagan v. City of Vineland*, 22 F.3d 1283, 1291-94 (3d Cir. 1994).

In the Sixth Circuit, a plaintiff cannot prevail against a municipality where none of the individuals involved violated his constitutional rights. *See Bowman v. Corrections Corp. of America*, 350 F.3d 537 (6th Cir. 2003) ("[W]ithout a constitutional violation of Anthony's Eighth Amendment right by Dr. Coble or Warden Myers, CCA cannot be held liable for its policy, even if it were to encourage deliberate indifference."); *Garner v. Memphis Police Dept.*, 8 F.3d 358 (6th Cir. 1993)*; Doe v. Sullivan County,* 956 F.2d 545 (6th Cir. 1992)*; Willis v. Neal*, 247 F. App'x 738 (6th Cir. 2007) (Dowd, J., dissenting). This much is clear from the Sixth Circuit's decisions in *Bowman*, *Harbin*, and *Garner*. In *Bowman*, a prison inmate died allegedly as a result of the prison's policy of providing insufficient medical care. The court held that where none of the individuals were found to have acted with deliberate indifference, the institution could not be liable irrespective of whether its policy "were to encourage deliberate indifference."

Several courts have suggested that a municipality can be held liable where a policy or custom was enacted with deliberate indifference to its consequences, regardless of whether the individual employee who carries it out acts with deliberate indifference. *See, e.g., Gibson v. County of Washoe*, 290 F.3d 1175 (9th Cir. 2002); *Fagan v. City of Vineland*, 22 F.3d 1283 (3d Cir. 1994). However, these cases concerned factual and legal scenarios markedly different from that present here. In any case, even if Scott County could be held liable for its policy independent of the actions of its employees, there would be no basis for imposing liability here. There is no

evidence that the Scott County policymakers were deliberately indifferent. The only officials implicated are Jailer Larry Covington and Coroner John Goble. Leaving aside the question of their authority to implement such a custom, there is no evidence from which to infer deliberate indifference on their part. There was not a pattern of such suicides to put them on notice; nor were there other warning signs that a problem might occur. The only other suicide discussed by the parties occurred years before, and involved an inmate who *was* cut down. Hence, there is no indication that anyone was aware of the risks presented by this particular policy. Such a lack of awareness might amount to negligence, but it falls far short of deliberate indifference. *See  Wright v. Taylor*, 79 F. App'x 829, 831 (6th Cir. 2003) (noting that even gross negligence is insufficient for purposes of § 1983). The plaintiffs were required to "present scienter-like evidence of indifference on the part of a particular policymaker." *Simmons v. Philadelphia*, 947 F.2d 1042, 1060-61 (3d Cir. 1991). Because they have not, the defendants are entitled to summary judgment.

## B. State Causes of Action

Alcorn also asserts various state law causes of action, including negligence, gross negligence, negligent supervision, intentional infliction of emotional distress, and loss of consortium. This court declines to rule on these causes of action.

The defendants each took different approaches to the state law claims. Coroner Goble argued that he is entitled to immunity on all of Alcorn's state claims because he did not act in bad faith. *See Rowan County v. Sloas*, 201 S.W.3d 469 (Ky. 2006). In

contrast, the Scott County defendants merely stated that the "remaining claims sounding in tort should be dismissed without prejudice with leave to refile them in the Scott County Circuit Court should they desire to pursue them." Last, the remaining defendants only recently moved for summary judgment, and their motion is not yet ripe. Hence, although the federal claims have been dismissed against certain defendants, several defendants have only recently moved for summary judgment, and this court has thus not had occasion to examine the validity of the claims against them.

This court has discretion to exercise supplemental jurisdiction. 28 U.S.C. § 1367. At this point in the proceedings, the relevant factors in § 1367 point toward exercising jurisdiction over the remaining state claims. Not only will several defendants remain even after the present motions are granted, but the moving defendants have approached the state claims in various ways. For all these reasons, the motions to dismiss the state causes of action will be denied.

### III. Conclusion

Accordingly,

**IT IS ORDERED** that the motion for summary judgment by defendants Larry Covington, Ryan Smith, Shawn Stroub, Paul Abney, Mark Mulligan, Michael Humphrey, Robbie Grossl, Bobby Townsend, and Jimmy Barns in their individual capacity and in their official capacity, and by the Scott County Detention Center and the Scott County Fiscal Court (R. 43) is **GRANTED.**

**IT IS FURTHER ORDERED** that the motion for summary judgment by John Goble in his individual capacity and his official capacity, and by the Scott County

Coroner's office (R. 48) is **GRANTED** as to the federal causes of action. The motion is **DENIED** without prejudice as to the state causes of action.

The plaintiffs' federal claims against the above-named defendants are dismissed with prejudice. The court will retain jurisdiction over the plaintiffs' state claims.

**IT IS FURTHER ORDERED** that the joint motion to extend certain discovery deadlines, R. 75, is **GRANTED**. The parties' deadline for completion of discovery shall be extended to August 1, 2011, for the limited purpose of deposing plaintiff Lisa Maynard.

Signed on  May 27, 2011

JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY